## STATE v. JOHN BELTOWSKI.

98 N. W. (2d) 252.

July 17, 1959—No. 37,634.

*John Beltowski,* pro se, for relator.

*Miles Lord,* Attorney General, *Charles E. Houston,* Solicitor General, *George M. Scott,* County Attorney, and *Per M. Larson,* Assistant County Attorney, for respondent.

NELSON, JUSTICE.

The defendant was found guilty of the crime of burglary in the third degree before the Hennepin County District Court and a jury. He was thereafter arraigned on three prior convictions to which he pleaded guilty.

The district court, pursuant to defendant's motion for an unabridged trial transcript, ordered in lieu thereof that a synopsis of the trial proceedings and the testimony given at the trial of defendant, prepared by the court reporter at the trial, consisting of 251 typewritten pages, be filed with the clerk of the District Court of Hennepin County so as to be made available to this court and a duplicate copy made available to defendant by delivery to him at the Minnesota State Prison.

While defendant's failure to conform to the laws and rules of this court in not presenting the 251-page synopsis in the form of a settled case could subject his appeal to a motion for dismissal, the state has suggested that since defendant has obtained the partial transcript and has made some use thereof in presenting his briefs, it would be inclined, if permission is granted by this court, to waive relator's failure to so present it in order that the points raised in his brief may be decided on the merits. Of course no question can be raised as to the sufficiency of the evidence without a settled case or bill of exceptions. Defendant, however, appears in his own behalf on this appeal, and it must be assumed that his failure to have the case settled is due to his lack of knowledge of court procedure. We have therefore proceeded as suggested by the state to examine the transcript as submitted.

Some of the pertinent facts disclosed by the transcript are these: On November 21, 1957, sometime after 10:20 p. m., Dalton's Dairy Store, located at 4310 Bryant Avenue South, Minneapolis, was burglarized. At about 10:20 on the same evening John Dalton, operator of the store, locked and bolted the doors leading into the building. On the following day Mr. Dalton arrived at his place of business about 10 o'clock in the forenoon and found the front door to his place of business pulled shut and locked. It was all "jimmied up" and the key would not work. He was unable to enter by way of the door. It looked as though it had been pried open by some object similar to a pinchbar (such was found in defendant's car) and marks appeared on the edge of the door and on the doorjamb, indicating that it had been forced open. Mr. Dalton secured help from a man in an adjoining hardware shop to get the door open, and upon entering the store, he soon discovered that certain property was missing. Whoever had committed the burglary had purloined 51 cartons of cigarettes, one box of candy (Brach's chocolates), and a cigar box containing $200 in bills placed in an envelope to be deposited in connection with issuing express money orders and the equivalent of $10 in money and stamps. Six cases of beer and four 6-packs of beer had been taken. The record indicates that Mr. Dalton had visited his dentist, a Dr. Carney, for dental work on November 12, 1957. A receipt for payment of his dental bill had been placed in the cigar box containing the money and stamps.

Mr. Dalton identified the cigar box among the items found in defendant's car and found that the dental receipt had not been removed. Incidentally, the cigarettes which had been taken from the Dalton store contained the number of the state seal placed on cigarettes sold by Dalton; namely, 23992. This was the number upon the cigarette cartons found in defendant's car. Mr. Dalton identified the box in which they had been removed. The box of Brach's chocolates, together with some of the beer and cigarettes had been taken by defendant to his mother-in-law's home and consumed there. The box from which some of the cigarettes had been removed contained 16 cartons of various brands. The beer packs and cases which had been stolen represented different kinds—Gluek's, Grain Belt, and Hamm's.

Michael Hlady, a detective who appeared as a witness for the state, testified that he met John Beltowski on November 22, 1957, between 8 a. m. and 4 p. m.; that he encountered the defendant in the back of what is known as 1515 Washington Avenue North, standing by a 1950 Plymouth sedan automobile. Defendant said he was John Bell when asked for his name. Detective Hlady placed defendant under arrest, took him to the squad car, and placed him in the back seat. He thereupon went to the defendant's car and started a search. He not only found the articles that have been referred to, but eight .38 caliber shells in the glove compartment, a pair of gloves and a loaded gun inside the gloves on top of the heater, the cigar box in which the Dalton money, stamps, and dental receipt had been kept under the front seat, and a pinchbar, which had most likely been used to pry open the door of the Dalton store. The testimony of the state shows that there was a more or less complete supply of burglar's tools in defendant's automobile in addition to the purloined items of which the defendant denied any knowledge. These stolen items were all identified and offered in evidence at the trial. There is ample proof that the defendant and his wife had packed and were in the process of leaving town when accosted by the detectives around 1 p. m. on the day following the burglary.

Mrs. Aurora Hanson, mother-in-law of defendant, testified on behalf of the state. She said that she lived with her son Bruce and her husband at 1515 Washington Avenue North; that Diane, the wife of

defendant, was also her daughter. She testified that the defendant and his wife came to their house shortly before noon on Wednesday, November 22, that she was told that they were packing and about to leave town. It was then that they brought her the Brach's chocolates, some of the purloined beer, and also a carton of the cigarettes. She testified that the defendant had told her that one of the suitcases which they had found in the car had been used at one time to carry burglar's tools. Either defendant or his wife had introduced one Harry West to Mrs. Hanson. West had been seen with the defendant on both the 21st and 22nd of November 1957. The record discloses that he had been a fellow prisoner of the defendant in Stillwater prison and that defendant hinted around after the burglary to the detectives that possibly some of the items that they found in defendant's car had been placed therein by Harry West. West was brought to the courtroom by the state during defendant's trial. While not called as a witness by the state, he was kept there for the purpose of being available should the defendant wish to call him as a witness in his behalf. West was not called as a witness. Strangely, the defendant did not even call his wife to testify in his behalf. Evidently the defendant must have feared that they knew too much about the actual facts surrounding the burglary to risk placing them on the witness stand.

The transcript shows that another detective by the name of Everson had been present with detective Hlady. Everson testified that the defendant refused to explain his possession of the stolen property and contemptuously answered him in the following manner according to the conversation as related by Everson:

"Q.   Relate the conversation as you recall it?

"A.   Well, Mr. Beltowski said he wanted to call an attorney and I told him he could, I said, 'What attorney do you want to call?', and he didn't say any more about it and then I asked him how the cigarettes came to be in the car and he said he knew nothing about that; I asked him if he would care to give a statement covering his activities of that night but he said, 'What is the matter with you, do you think I'm crazy?', he said, 'I won't tell you nothing.', he said, 'Get away from here and leave me alone.' "

An indication of defendant's truthfulness, or lack of it, may be found in the following answers and questions by the attorney for the state when the defendant was on the witness stand:

"Q. Well, you said that you last saw State's Exhibit G, the pinch bar, in the courtroom in Municipal Court, is that correct?

"A. Yes, yes.

"Q. Would you say you saw the pinch bar there?

"A. Yes.

"Q. Did you also see the tools there, sir?

"A. No, I didn't.

"Q. Does the pinch bar belong to you, sir?

"A. No.

"Q. Never saw it before that day?

"A. No.

"Q. Do you know, recall, sir, that when you were in Municipal Court only the cigarettes and the Harvester cigar box were in court and this pinch bar never went anywhere near the courtroom?"

Investigation disclosed that defendant had served a workhouse term either in June or July of 1957, had escaped from the workhouse and that sometime during the year he had been released from the Minnesota State Prison at Stillwater after serving a 5-year term. After being found with the stolen property in his possession, the firearms and suspicious tools in his car, defendant was charged with having burglarized the Dalton store. Later upon completion of trial, the defendant was found guilty of burglary in the third degree as charged in the information filed against him.

■ The following summary may be gleaned from the evidence presented at the trial as disclosed by such parts of the transcript as have been made available:

(1) The positive identification by John V. Dalton of certain property taken from his store and particularly Dr. Carney's receipt for dental services—found in relator's car.

(2) The ownership and possession of the automobile by relator.

(3) The giving of some of the stolen property by relator to Mrs. Hanson, the mother of relator's wife, Diane.

(4)   The attempted hasty departure from Minneapolis by relator with the stolen property—after being told by detectives they had been looking for him.

(5)   The giving of a false name to detective.

(6)   The possession of burglar tools, hacksaw and pinchbar, etc.

(7)   The admission made by relator to Mrs. Hanson—that tools contained in a suitcase at one time, were burglar tools.

(8)   The possession of a revolver and shells.

(9)   The lack of truthful explanation of possession of stolen property.

All of these factors, we think, speak loudly and carry their own permissible interpretation—an interpretation which the jury must have concluded, from the whole of the evidence, should be put upon them.

Defendant relies upon the following cases as authority for obtaining a reversal in the present appeal: State v. James, 123 Minn. 487, 144 N. W. 216; State ex rel. Dehning v. Rigg, 251 Minn. 120, 86 N. W. (2d) 723; State v. Gress, 250 Minn. 337, 84 N. W. (2d) 616; State v. Haney, 219 Minn. 518, 18 N. W. (2d) 315; and Mallory v. United States, 354 U. S. 449, 77 S. Ct. 1356, 1 L. ed. (2d) 1479. The facts in the aforesaid cases are not similar to those in the present case. Upon examination we find that the cases cited are not in any instance applicable to the situation in the case at bar.

■ The state cites the following cases as controlling both upon the facts and the law in the instant case: State v. Anderson, 155 Minn. 132, 192 N. W. 934; State v. Couplin, 146 Minn. 189, 178 N. W. 486; State v. Minot, 79 Minn. 118, 81 N. W. 753; and State v. Johnson, 33 Minn. 34, 21 N. W. 843. A reading of the foregoing cases cited by the state, we think, furnishes ample authority to support the jury's verdict herein that the crime alleged in the information was committed by the defendant and that his guilt was proved beyond a reasonable doubt.

Defendant was represented throughout by competent counsel who apparently defended with vigor. Any hints that he was not properly represented are somewhat veiled. He contends of course that he was wrongfully arrested without warrant and his car searched without a search warrant in the hands of the officers; that he was held in jail for

several days without being afforded a preliminary hearing until a week or more had passed; that the evidence as to identification and connecting him with the burglary is entirely circumstantial and not sufficient to sustain the conviction; that he was denied a fair and impartial trial; and that it was error on the part of the court not to furnish him with an unabridged transcript covering the whole of the proceedings and the testimony at the trial. Because of defendant's numerous assignments of error, we have carefully examined the 251-page synopsis or transcript compiled by the reporter at the trial and the entire record, including the clerk's files in the court below. While it is true that much of the evidence was circumstantial, we are nevertheless compelled to hold that the evidence amply supports the verdict of the jury. It is our conclusion that the jury could reach their verdict against the defendant upon evidence establishing his guilt beyond a reasonable doubt. It would serve no useful purpose for us to relate in more detail than has already been done the evidence which by compelling inference connected defendant both with the commission and the accomplishment of this crime.

The judgment is therefore affirmed.